**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

LUKEMAN A. MADYUN, a/k/a.
ABDUALLAH LUKEMAN MADYUN,

                Petitioner,                    Case No. 05-74784
                                                        Honorable Marianne O. Battani

v.


ANDREW JACKSON,

                Respondent.
_____/

**OPINION AND ORDER DENYING PETITIONER'S**
**PETITION FOR WRIT OF HABEAS CORPUS**

**I. Introduction**

Before the Court is Lukeman A. Madyun's (Petitioner), a.k.a. Abduallah Lukeman

Madyun's, petition for a writ of habeas corpus, filed on December 16, 2005. (Docket # 1.)

Petitioner, a state inmate, currently confined at the Macomb Correctional Facility in New Haven,

Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner

was convicted of alternative counts of first-degree premeditated murder and first-degree felony

murder, assault with intent to commit murder, and possession of a firearm during the commission

of a felony. The felony-murder conviction was vacated, and Petitioner was sentenced to life

imprisonment for the first-degree murder conviction. He was also sentenced to fifteen to twenty-

five-years imprisonment for the assault with intent to murder conviction, and a consecutive term

of two-years imprisonment for the felony-firearm conviction, both to run concurrent with the

sentence for first-degree murder. For the reasons stated below, the Court denies the petition for

writ of habeas corpus.

## II. Background

## A. Substantive Facts

This case arises from an incident which occurred on April 6, 2002, at approximately 1:30 p.m., in a house on Polk Street in the City of Taylor, Michigan. Janette Burden ("Ms. Burden or the deceased"), the former girlfriend of Petitioner, was killed. Jeremy Sturm, the complainant in the assault with intent to murder conviction, and Ms. Burden's new boyfriend, was wounded. The second assault-with-intent-to-murder complainant, Virginia Efird, was also wounded. The defense theory was provocation and voluntary manslaughter.

Ms. Burden died from a single gunshot wound; the bullet entered the right upper back, exited from the left chest and continued through the left upper arm. Additionally, the autopsy revealed "very remarkable" circular, non-penetrating imprints on the right cheek of Ms. Burden, apparently caused by the end of the gun. The autopsy also revealed two specific patterns of round dots, one set in the middle of Ms. Burden's forehead, and the other on her upper right arm, which, according to the testimony of the medical examiner, were consistent with having been caused by a taser.

Ms. Efird, one of the complainants who was injured, testified that she had known Ms. Burden for about eight (8) years. She said that they had met while in North Carolina. Ms. Efird moved to Michigan in 1997,and Ms. Burden moved in February 2002, and stayed with Ms. Efird in her home on Polk Street in Taylor, Michigan. It was Ms. Efird's testimony that she met Petitioner in February 2002, when she went to North Carolina to help Ms. Burden move. She said that she had overheard Ms. Burden telling Petitioner that she (Ms. Burden) did not want

anything to do with him. However, about two weeks before the shooting, Petitioner came to Michigan to visit Ms. Burden and stayed with her. Ms. Efird testified that Mr. Sturm, the other complainant in the case, and the deceased's new boyfriend, was around the weekend of Petitioner's visit, but that Petitioner was not yet aware that Ms. Burden and Mr. Sturm were girlfriend and boyfriend.

According to Ms. Efird's testimony, on April 6, 2002, four people were at her house, including herself, Ms. Burden and Mr. Sturm, and her friend, Chris Fulton. She said that early in the evening, Petitioner arrived and knocked on the door. It was her testimony that, at first, no one answered the door; then, Petitioner started talking, telling the deceased that he was not armed, and that he just wanted to talk to her. Ms. Efird testified that she did not trust Petitioner so, she armed herself with a dagger. Eventually, Petitioner was let inside to talk to Ms. Burden. However, Ms. Efird said that she told Petitioner that if he moved, she would cut him. Ms. Burden reassured her that it would be okay. Ms. Burden and Petitioner then went into the bedroom to talk. Mr. Sturm and Mr. Fulton took the dagger away from Ms. Efird.

Ms. Efird testified that Petitioner left after about thirty to sixty minutes, asking her for directions to a nearby motel. After she gave him the information, he left the house. Subsequently, they all went to bed. Ms. Efird said that, soon after they all went to bed, she got a call on her cell phone from Petitioner; she told him to call Ms. Burden, which he did.

Shortly after, Ms. Efird testified that she heard glass breaking and heard Ms. Burden screaming. She said that she got up and went into Ms. Burden's bedroom, where she witnessed Mr. Sturm struggling with Petitioner; Mr. Sturm had Petitioner in a headlock and had Petitioner's arm pinned against the wall. Ms. Efird said that Petitioner had a taser in one hand,

but she did not see a gun at that time.  She said that she pulled Ms. Burden from the room, and

that Petitioner followed, pushing Ms. Burden to the floor in the living room.  According to Ms.

Efird's testimony, Petitioner then pulled out a gun and fired three shots at Mr. Sturm.  She said

that she and Ms. Burden ran through the living room to the kitchen, where there was a backdoor,

which they tried to open.  Petitioner followed, and fired two shots at them, one shot grazed Ms.

Efird and struck Ms. Burden.  Ms. Burden tried to come back into the house, but Petitioner

pushed her down onto the back porch and began beating her.  Ms. Efird tried to intervene, but

was not able to; she said that Petitioner just kept beating Ms. Burden.  She said that Petitioner

stomped on Ms. Burden's chest, saying that he hoped that she would die, and then left the house.

Ms. Efird then testified that it was only a few seconds later when Petitioner re-entered the

house and began turning over tables, the T.V., and was trashing the entertainment center.  Ms.

Efird ran to a neighbor's house and called the police.  She returned to the house when the police

arrived, finding Ms. Burden dead.

Mr. Sturm also testified.  He said that he had known Ms. Burden for about three to five

months, and met Petitioner approximately two weeks before the shooting.  According to Mr.

Sturm's testimony, he was aware that Ms. Burden and Petitioner had previously been in a

relationship, but was unaware if it had continued after she had moved to Michigan.  He said that

he had wanted to become romantically involved with Ms. Burden when Petitioner came to visit

that weekend in March.  He said that during that weekend, Ms. Burden had asked him to agree to

act as though they were not in a relationship while Petitioner was there, to which he obliged.

Mr. Sturm's testimony corroborated that of Ms. Efird's.  He said that in the evening on

April 6, 2002, Petitioner knocked on the door of Ms. Efird's home; he testified that she did not want to let him in, and armed herself with a knife. He said shortly afterward, she let him in, and Petitioner and Ms. Burden then went into a bedroom to talk. He testified that after about thirty minutes, Petitioner left; Mr. Sturm did not hear any arguing.

According to Mr. Sturm's testimony, later that night, he and Ms. Burden retired; he was awaken by something coming through the bedroom window. He said that Petitioner climbed through the bedroom window and entered the room. Mr. Sturm testified that he had struggled with Petitioner for about thirty seconds, and that Petitioner pulled out a taser. Mr. Sturm said that he then let go of Petitioner. According to Mr. Sturm's testimony, Petitioner left the bedroom for a few seconds, returning with a gun and pointed it at Mr. Sturm. Petitioner hit Mr. Sturm in the head with the gun several times; Mr. Sturm grabbed Petitioner and several shots were fired; Mr. Sturm received a wound in his left arm and a grazing wound on his right arm. Petitioner then left the bedroom. Mr. Sturm ran into the bathroom, and locked the door.

Mr. Sturm testified that he then heard Petitioner banging on Ms. Efird's bedroom door, and he tried to open the bathroom door. Mr. Sturm said that he escaped through the bathroom window, and ran to a nearby K-Mart, where he called 911.

Mr. Fulton testified that he and Ms. Efird dated previously, but were not really dating at the time of the incident in question. He said that he met Ms. Burden about three days before her death. According to his testimony, Petitioner came to Ms. Efird's house that evening, but was not let into the house. He said that Ms. Efird had armed herself with a knife, but that he and Mr. Sturm had retrieved the knife and hid it. It was his testimony that Petitioner was eventually let into the house, where he then went into a bedroom with Ms. Burden. Mr. Fulton said that when

Petitioner exited the bedroom, he asked for directions to a nearby motel and then left.

It was Mr. Fulton testimony that around 1:30 a.m., he heard some glass breaking. He said that Ms. Efird got up and went into Ms. Burden's bedroom. Mr. Fulton followed. He testified that he saw Mr. Sturm and Petitioner struggling; Ms. Burden attempted to break up the struggle, but was pushed away. Mr. Fulton said that he went to grab Petitioner, but Petitioner pulled out a gun. Mr. Fulton said that he froze. He said that Petitioner then re-entered Ms. Burden's bedroom and fired some shots at Mr. Sturm. He saw Mr. Sturm, who was bleeding, go into the bathroom; Mr. Fulton then closed the bedroom door and held it shut. Mr. Fulton said that he heard more shots being fired and heard furniture being knocked over. He said that Petitioner then tried to get into the bedroom, but he held the door shut. It was Mr. Fulton's testimony that Petitioner was at no time acting calmly. Rather, Petitioner was very angry and in a rage the entire time. When the house was quiet, Mr. Fulton came out of the bedroom, finding Ms. Burden on the floor of the back porch, with no pulse. Shortly afterward, the police arrived.

Dale Chapman, a Taylor, Michigan, police officer, was the first police officer to arrive at the scene. When he arrived, Officer Chapman testified that he saw footprints in the snow outside, going around to the back of the house. He also saw footprints outside one of the bedroom windows, and he saw that that particular bedroom window was shattered. Once inside the bedroom, Officer Chapman found a piece of concrete. He saw Ms. Burden's body on the floor of the back porch. Officer Chapman testified that the house was in disarray, with furniture knocked over; spent casings, and one live bullet were found. He said that he found a leather

jacket with Petitioner's identification inside the jacket. Shortly after, another Taylor police

officer, Officer Scott Atkinson arrived on the scene.

Officer Atkinson testified that he recovered a .40 caliber handgun and a taser from a garbage can on Westpointe Street in Dearborn Heights. He said that there were no bullets in the gun. Officer Atkinson described the boot prints he found in the snow outside the Polk Street house as consistent with a person lingering outside the window. He testified that the prints appeared to go from the house to an area behind the neighbor's garage; behind that garage Officer Atkinson found a pile of broken concrete.

Dearborn Heights Officer Charles Lux testified that he was on routine patrol that night, when he saw Petitioner running down a street. Officer Lux stopped Petitioner; the officer was directed by Petitioner to a driveway on Westpointe Street, where he had parked his car, a 1991 Escort. Officer Lux said that Petitioner was cooperative. He asked Petitioner about the gun and was directed to a garbage can near the parked car. Officer Lux saw the gun and the taser inside the garbage can. He held Petitioner until the Taylor police arrived.

Taylor Officer Nolan Schilz testified that he responded to the call from the K-Mart store. When he arrived at the store, he found Mr. Sturm naked and covered in blood inside the restroom; Mr. Sturm was bleeding severely from the wound on his arm. Officer Schilz asked Mr. Sturm who had shot him and, Mr. Sturm told him that Petitioner had shot him. Mr. Sturm told Officer Schilz that he and Ms. Burden were engaged in sexual intercourse in her bedroom when a brick came through the bedroom window. According to Officer Schilz's testimony, Mr. Sturm told him that Petitioner had climbed through the bedroom window, that he had struggled with

him, that another female came into the bedroom, and that Petitioner then ran out of the bedroom, returning with a gun, and firing shots at them.

Taylor Detective John Ruth testified that he had received a call about the shooting; he was the officer-in-charge of the case. When he arrived at the scene, he found Ms. Burden's body on the floor of the back porch. He said that he saw blood in the different areas of the house, and saw that the furniture was strewn about. Later that morning, Detective Ruth interviewed Petitioner, where he learned that Petitioner had a cut on his stomach, which he said he got while climbing through the bedroom window. According to Detective Ruth's testimony, Petitioner wanted to talk and wrote out answers to his questions. During the course of Petitioner's statement, he said that he had known Ms. Burden for about three years and that she had promised him that they would be together. Petitioner's statement to Detective Ruth suggests that he wanted to hurt Ms. Burden and Mr. Sturm, and that he went to the house because he wanted to kill them. Petitioner did not testify at trial.

## B. Procedural History

On September 4, 2002, following a jury trial, in Wayne County, Michigan, Circuit Court, Petitioner was convicted of alternative counts of first-degree premeditated murder and first-degree felony murder, assault with intent to commit murder, and felony firearm. The felony-murder conviction was vacated. On September 18, 2002, Petitioner was sentenced to life imprisonment for the first-degree murder conviction, fifteen to twenty-five years imprisonment for the assault with intent to murder conviction, and a two-year-mandatory imprisonment for the felony-firearm conviction, both convictions to run concurrent with Petitioner's sentence for first-degree murder.

Petitioner, through counsel, filed his claim of appeal to the Michigan Court of Appeals within the appropriate time, alleging the following:

I.   Was the trial court's refusal to suppress Mr. Madyun's confession as having been involuntarily made clearly erroneous and a deprivation of Mr. Madyun's state and federal rights to due process of law where Mr. Madyun was sleep deprived and the investigating officer failed to adequately ascertain the extent of Mr. Madyun's injuries or provide any treatment for the injuries until after the statement had been secured?

Petitioner also filed a *pro per* supplemental brief, raising the following claims:

II.   Was [Petitioner] denied due process of law and a new trial when the prosecution failed to present sufficient evidence of "premeditation and deliberation" necessary to convince a rational trier of fact of each essential element of the charged offense?

III.   Was [Petitioner] denied due process and a fair trial when the prosecution failed to comply with the rules of discovery and withheld possible exculpatory evidence from the defense?

IV.   Was [Petitioner] denied due process of law and a fair trial by the repeated use by the prosecution of graphic color photographs?

V.   Was [Petitioner] denied due process of law and a fair trial when the prosecution made improper comments during closing arguments?

VI.   Was [Petitioner] denied effective assistance of counsel when trial counsel failed to object to improper prosecutorial comments and inadmissible evidence?

VII.   Was [Petitioner] denied due process to the cumulative effect of the prejudicial errors committed during his trial?

VIII.   Does [Petitioner's] sentence of mandatory non-parolable life imprisonment for first-degree murder constitute cruel and unusual punishment, and mandatory two years for

felony firearm are both determinate sentences which violate
the Michigan Constitution 1963, art. I, sec. 45?

On June 29, 2004, the Michigan Court of Appeals affirmed Petitioner's conviction.

*People v. Madyun*, No. 246016, 2004 WL 1459446 (Mich.App. June 29, 2004), and denied

Petitioner's motion for reconsideration. *People v. Madyun*, No. 246016 (Mich.App. Aug. 24,

2004). Petitioner then filed an application for leave to appeal to the Michigan Supreme Court,

raising the following five issues:

> I.    Prosecutor failed to present sufficient evidence of
>       premeditation.
>
> II.   Prosecution failed to comply with the rules of discovery.
>
> III.  [Petitioner] was denied due process of law and the fair trial
>       by repeated use by the prosecution of graphic color
>       photographs.
>
> IV.   I wish the Court to just review this issue by the COA.
>
> V.    [Petitioner] was denied the effective assistance of counsel
>       when the trial counsel failed to object to improper
>       prosecutorial comments and inadmissible evidence.

The Michigan Supreme Court denied leave on January 31, 2005. *People v. Madyun*, 472 Mich.

862, 692 N.W.2d 385 (2005).

Petitioner did not file a petition for a writ of certiorari in the United States Supreme

Court, nor did he file a motion for relief from judgment pursuant to sub-chapter 6.500 of the

Michigan Court Rules. Petitioner's petition is timely in that it was filed less than one-year

following the date on which Petitioner's conviction became final by virtue of the expiration of

the period for him to file a petition for a writ of certiorari in the United States Supreme

Court–ninety days (90). 28 U.S.C. § 2244(d)(1)(A). No previous petitions have been filed in

this or any other federal district court by Petitioner.

Petitioner filed the pending petition for writ of habeas corpus on December 16, 2005, challenging his convictions on the following grounds:

I. The trial court's refusal to suppress Mr. Madyun's confession was clearly erroneous and a deprivation of Mr. Madyun's state and federal rights to due process of law as the investigating officer failed to adequately ascertain the extent of Mr. Madyun's injuries until after the statement had been secured.

II. Petitioner was denied due process and a fair trial when the prosecution failed to present sufficient evidence of premeditation and deliberation necessary to convince a rational trier of fact of each essential element of the charged offense.

III. Petitioner was denied due process and a fair trial when the prosecution failed to comply with the rules of discovery and withheld possible exculpatory evidence from the defense.

IV. Petitioner was denied due process of law and a fair trial by the repeated use by the prosecution of graphic color photographs.

V. Petitioner was denied due process of law and a fair trial when the prosecution made improper comments during closing arguments.

VI. Petitioner was denied effective assistance of counsel when trial counsel failed to object to improper prosecutorial comments and inadmissible evidence.

VII. Petitioner was denied due process to the cumulative effect of the prejudicial errors committed during his trial.

VIII. Petitioner's sentence of mandatory non-parolable life imprisonment for first-degree murder constitutes cruel and unusual punishment and mandatory two years for felony firearm are both determinate sentences which violate the Michigan Constitution 1963, art. I., sec. 45.

### III. Standard of Review

Petitioner's application was filed after April 24, 1996, therefore, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214 (April 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Specifically, the AEDPA states in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

28 U.S.C. § 2254(d).

Under (d)(1), a federal court may grant a writ of habeas corpus under two different clauses, both of which provide two bases for relief. Under the "contrary to" clause, a federal court may grant habeas relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or, (2) if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The words "contrary to" should be construed to mean "diametrically different, opposite in character or nature, or mutually opposed." *Id.*

Under the "unreasonable application" clause, a federal court may grant habeas relief if the state court identifies the correct governing legal principle from the Supreme Court's

decisions but unreasonably applies that principle to the facts. *Williams*, 529 U.S. at 407-08.

Relief is also available under this clause if the state-court decision either unreasonably extends

or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new

context. *Id.* at 407; *Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005). The proper inquiry for

the "unreasonable

application" analysis is whether the state court decision was "objectively unreasonable" and not

simply erroneous or incorrect. *Williams*, 529 U.S. at 407; *Lordi v. Ishee*, 384 F.3d 189, 195 (6th

Cir. 2004).

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of

whether the state court's decision comports with "clearly established federal law as determined

by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to

[the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to

the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant

state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the

governing legal principle or principles set forth by the Supreme Court at the time the state court

renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted)

(quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the

benchmark for habeas review of a state-court decision, the standard set forth in § 2254(d) "does

not require citation of [Supreme Court] cases–indeed, it does not even require awareness of

[Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision

contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). Although the requirements of "clearly

established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Dickens v. Jones*, 203 F.Supp. 354, 359 (E.D. Mich. 2002).

## IV. Discussion

## A. Voluntary Confession Claim–Claim I

Petitioner first contends that his statements to the police were involuntary because he had not slept for about twenty-four hours, was emotionally distraught, and was injured. A *Walker* hearing was held by the trial court on defense counsel's motion to suppress Petitioner's statement, and, during that hearing, there was testimony (1) that Petitioner never indicated that he did not want to speak with police, (2) that Petitioner did not mention being too tired or injured, (3) that Petitioner declined an offer of breakfast, (4) that Petitioner signed an advice of rights form before being questioned, and, (5) that Petitioner handwrote his answers to the officer's questions. It is Respondent's position that Petitioner has therefore failed to rebut the state court's findings that his statements were voluntary and not coerced.

The Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions against the accused. *Colorado v. Connelly*, 479 U.S. 157, 163-164 (1986). When a defendant claims that his confession was coerced, the government has the burden of proving that the confession was voluntary by a preponderance of the evidence. *Seymour v. Walker*, 224 F.3d 542, 554 (6th Cir. 2000). A confession is considered involuntary if: (1) the police extorted the confession by means of coercive activity; (2) the coercion was sufficient to overbear the will of the accused; and (3) the will of the accused was in fact overborne by the coercive police activity. *Hill v. Anderson*, 300 F.3d 679, 682 (6th Cir. 2002).

-14-

Factors to consider include the defendant's age, education, and intelligence; whether the defendant was informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep. *United States v. Mahan*, 190 F.3d 416, 422-423 (6th Cir. 1999). That a suspect may be in the hospital, in pain, and under medication does not in itself render his statement involuntary so long as he is not impaired due to pain or medication. *Abela v. Martin*, 380 F.3d 915, 928 (6th Cir. 2004) (statement of suspect in the hospital with a broken nose, in pain, and vomiting, but not impaired as a result of alcohol or medication, found to be voluntary). When a suspect suffers from some mental incapacity, such as intoxication or mental disability, and the incapacity is known to the interrogating officers, a "lesser quantum of coercion" is necessary to call a confession into question. *Hill*, 300 F.3d at 682.

Additionally, in *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court held that the privilege against self-incrimination not only protects individuals from compulsion to testify in a criminal courtroom, but also from "informal compulsion exerted by law-enforcement officers during in-custody questioning." *Id.* at 461. A custodial interrogation means questioning initiated by the police after the person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Id.* at 444. "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994).

To protect the right against self-incrimination of a person in custody, the Supreme Court

determined that "prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Pennsylvania v. Muniz*, 496 U.S. 582, 589 (1990). Unless the suspect knowingly, voluntarily, and intelligently waives these rights, any incriminating responses to the questioning will be excluded. *Id.*

Here, a *Walker* hearing was held to determine whether the statements in question could be used as evidence at trial. It is Petitioner's argument that his confession was involuntary because he had not slept for about twenty-four hours, was emotionally distraught, and had a cut on his stomach, although he acknowledges that he was in-custody for about six of those twenty-four hours, and that the police were unaware of the cut on his stomach. The Michigan Court of Appeals, the last court to issue a reasoned decision in this case, stated in pertinent part:

> The evidence disclosed that defendant had been in custody for approximately six hours before the police interview, which lasted approximately 2-1/2 hours. When the police asked defendant if he had any physical problems, he did not mention that he was tired. With respect to defendant's abdominal injury, the interviewing officer described the cut as shallow, and defendant did not mention the injury before the interview or complain that he was in physical pain during the interview. The evidence did not disclose any other circumstances suggesting that defendant's statement was not voluntarily made, the trial court did not err in denying defendant's motion to suppress the statement.

*People v. Madyun*, No. 246016 2004 WL1459446 (Mich.App. June 29, 2004), slip op. at 1.

Under 28 U.S.C. § 2254(e)(1) of the AEDPA, the factual findings of the state courts are presumed correct unless rebutted by clear and convincing evidence. *West v. Seabold*, 73 F.3d 81, 83 (6th Cir. 1996). Thus, the decision that Petitioner's statements were voluntary and not coerced are presumed correct. Petitioner simply reiterates his disagreement with the state court's

determinations, and that alone is insufficient to overcome the presumption of correctness of that decision.  Therefore, Petitioner is not entitled to habeas relief on this claim.

## B.  Insufficient Evidence Claim–Claim II

Petitioner next contends that he is entitled to a writ of habeas corpus because there was insufficient evidence of premeditation and deliberation to support his first-degree murder conviction.  However, contrary to Petitioner's position, testimony at trial indicated that Petitioner drove from North Carolina to the deceased's home in Michigan, briefly spoke with her earlier in the evening before returning to the home, armed with a handgun and an electric taser, breaking into her bedroom through a window, and then shooting her, after struggling with her boyfriend. Viewed in a light most favorable to the prosecution, a rational trier of fact could find that Petitioner formed the requisite intent before returning to the deceased's home.

A claim that the evidence was insufficient to convict a petitioner is cognizable under 28 U.S.C. § 2254.  Because the Due Process Clause "forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt," *Fiore v. White*, 531 U.S. 225, 228-29 (2001), "a state-law question regarding the elements of the crime predicates the enforcement of [Petitioner's] federal constitutional right."  *Richey v. Mitchell*, 395 F.3d 660, 672 (6th Cir. 2005).

Sufficient evidence supports a conviction if, after viewing the evidence (and all inferences to be drawn therefrom) in a light most favorable to the prosecution, the court can conclude that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003), *cert. denied*, 540 U.S. 1148 (2004).  This standard of review obviously does not

permit the federal court to make its own subjective determination of guilt or innocence; the standard gives full play to the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to the ultimate facts. *Herrera v. Collins*, 506 U.S. 390, 401-02 (1993); *McKenzie*, 326 F.3d at 727. This due process guarantee of sufficiency of the evidence extends only to facts needed to establish the elements of the crime and not to the state's burden to prove the absence of an affirmative defense; however, if the state has made the absence of a defense an element of the crime, sufficiency of evidence on the issue will then be relevant. *Allen v. Redman*, 858 F.2d 1194, 1196-98 (6th Cir. 1988). Circumstantial evidence may support a conviction and such evidence need not remove every reasonable hypothesis except that of guilt. *See Clifford v. Chandler*, 333 F.3d 724, 728 (6th Cir. 2003), *cert. denied*, 124 S.Ct. 1601 (2004); *Walker v. Russell*, 57 F.3d 472, 475 (6th Cir. 1995).

Deliberation and premeditation may be inferred from the facts and circumstances. *Cynars v. Hofbauer*, 383 F.3d 485, 491 (6th Cir. 2004) (citing *People v. Coddington*, 188 Mich.App. 584, 470 N.W.2d 478 (1991)). "Circumstantial evidence demonstrating premeditation includes, but is not limited to (1) the prior relationship of the parties, (2) defendant's actions before the killing, (3) the circumstances, including the wound's location, of the killing, and (4) defendant's conduct after the killing." *Id.* Deliberation and premeditation require sufficient time to "allow the defendant to take a second look." *Id.* "A few seconds between the antagonistic action between the defendant and the victim and the defendant's decision to murder the victim may be sufficient to create a jury question on the issue of premeditation." *Alder v. Burt*, 240 F.Supp.2d 651, 663 (E.D. Mich. 2003) (citing *People v. Glover*, 154 Mich.App. 22, 397 N.W.2d 199 (1986)).

Here, Petitioner contends that there was insufficient evidence of premeditation and

deliberation because the circumstances surrounding the offense showed adequate provocation to

mitigate first-degree murder to manslaughter.  The Michigan Court of Appeals rejected that claim

finding that a rational trier of fact could find that there was sufficient time for Petitioner to take a

second look at this actions and cool off during the four or more hours between leaving the

victim's home and returning to her bedroom window with his handgun and taser.  The state

appellate court held in pertinent part:

> When reviewing the sufficiency of the evidence in a
> criminal case, this Court must view the evidence in a light most
> favorable to the prosecution to determine whether a rational trier of
> fact could have found the essential elements of the crime proven
> beyond a reasonable doubt.  *People v. Wolfe*, 440 Mich. 508, 515;
> 489 NW2d 748 (1992), amended 441 Mich. 1201 (1992).

> First-degree premeditated murder is defined in MCL
> 750.316(1)(a) as a "willful, deliberate, and premeditated killing."
> The prosecution must establish "that the defendant intentionally
> killed the victim and that the act of killing was premeditated and
> deliberate."  *People v. Kelly*, 231 Mich.App 627, 642; 588 NW2d
> 480 (1998).  Premeditation and deliberation may be inferred from
> the circumstances surrounding the killing.  *Id.*

> The evidence showed that defendant drove from North
> Carolina to his former girlfriend's house in Michigan, left the house
> at approximately 7:30 or 8:00 p.m., and then returned sometime
> after midnight armed with a gun and a "taser."  During the offense,
> defendant told the victim, "I hope you die, B ."  In his statement to
> the police, defendant admitted that when he returned to his
> girlfriend's house, he intended to kill both her and her new
> boyfriend.  Viewed in a light most favorable to the prosecution, the
> evidence was sufficient to establish premeditation and deliberation
> beyond a reasonable doubt.

> The evidence was also sufficient to enable the jury to reject
> defendant's argument that the crime should be reduced to
> manslaughter.  A person "who has acted out of a temporary
> excitement induced by an adequate provocation and not from
> deliberation and reflection" is properly convicted of voluntary
> manslaughter.  *People v. Mendoza*, 468 Mich. 527, 535; 664 NW2d

685 (2003), citing *People v. Townes*, 391 Mich. 578, 590; 218
NW2d 136 (1974). The provocation necessary to reduce a murder
to manslaughter "must be adequate, namely, that which would
cause the reasonable person to lose control. Not every hot-
tempered individual who flies into a rage at the slightest insult can
claim manslaughter. The law cannot countenance the loss of self-
control; rather, it must encourage people to control their passions."
*People v. Pouncey*, 437 Mich. 382, 389; 471 NW2d 346 (1991)
(citation omitted).

The evidence showed that defendant met briefly with the
victim and her new boyfriend in the early evening before the
offense and then left. He did not return until after midnight and
admitted that his intent in returning was to kill the victim and her
new boyfriend. He entered the house through a window that he
broke with a brick or a rock, following which he shot the victim and
her boyfriend, and also injured another occupant of the house.
Viewed most favorably to the prosecution, the evidence was
sufficient to enable the jury to reject, as it did, defendant's claim
that the killing resulted from reasonable provocation as to mitigate
the homicide from murder to voluntary manslaughter.

*People v. Madyun*, No. 246016 2004 WL1459446 (Mich.App. June 29, 2004), slip op. at 1-2.

The Michigan Court of Appeals held that, based on the foregoing facts, a rational trier of fact

could have found Petitioner guilty of first-degree murder beyond a reasonable doubt. That

determination was itself correct and a reasonable application of *Jackson, supra*. Petitioner has

therefore failed to demonstrate that the state appellate court decision was contrary to, or an

unreasonable application of, clearly established United States Supreme Court precedent.

Accordingly, Petitioner is not entitled to federal habeas corpus relief with respect to this claim.

## C. Discovery and Use of Graphic Photographs Claims–Claims III and IV

In claims III and IV, Petitioner argues that he was denied a fair trial because (1) the

prosecution failed to turn over letters written to the deceased by Petitioner, found in the deceased's home, which could have established his state of mind, and, (2) the prosecutor repeatedly introduced photographs of the deceased, thereby invoking sympathy from the jury. Respondent contends that habeas review of those claims are barred because defense counsel failed to object at trial and thus they are procedurally defaulted. Furthermore, Respondent contends that Petitioner has failed to demonstrate cause and prejudice to excuse the procedural default.

When the state courts clearly and expressly rely on a valid state procedural bar, federal habeas review is also barred unless the petitioner can demonstrate "cause" for the default and actual prejudice as a result of the alleged constitutional violation, or can demonstrate that failure to consider the claim will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750-751 (1991); *see also Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005) (citing *Trest v. Cain*, 522 U.S. 87, 89 (1997)). Consequently, a federal court is not required to address a procedural default issue before ruling against a habeas petitioner on the merits of his claims. When a procedural default issue presents a more complicated question and is unnecessary to the disposition of the case, a court may proceed directly to the merits of the petitioner's claims in the interest of judicial economy. *See Lambrix v. Singleterry*, 520 U.S. 518, 525 (1997); *Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003); *Johnson v. Warren*, 344 F. Supp. 2d 1081, 1089 (E.D. Mich. 2004); *see also Strickler v. Green*, 527 U.S. 263, 282 (1999) (considering merits of habeas claims where such inquiry mirrored procedural default cause and prejudice inquiry); *see also Cameron v. Birkett*, 348 F. Supp. 2d 825, 836 (E.D. Mich. 2004) (same).

In the present case, resolving the procedural default issue will be more complex than deciding the substantive claims on habeas review and will require some consideration of the merits of those claims. Accordingly, in the interests of judicial economy, the Court will address the merits of these claims without ruling on the procedural default issue.

### 1. Claim III–Discovery claim–prosecutor's failure to produce letters written by Petitioner to the deceased

Regarding this issue, Petitioner argues that prior to trial, defense filed for discovery, to which the prosecution complied. However, during the cross-examination of Detective Chapman, it was learned that a box of letters was seized during the execution of a search warrant of the deceased's home, which Detective Chapman said he placed into evidence. However, it is Petitioner's position that the prosecution never produced those letters to the defense. Petitioner argues that, had those letters been provided, they could have established his state of mind prior to the incident.

Petitioner is essentially raising a *Brady v. Maryland*, 373 U.S. 83, 87 (1963), violation. Pursuant to the rule enunciated in that case, a defendant's due process rights are violated if the government suppresses favorable evidence where the evidence is material to guilt or punishment, irrespective to the good or bad faith of the prosecution. A true *Brady* violation consists of three components: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the state must have suppressed the evidence, whether wilfully or inadvertently; and (3) prejudice must have resulted. *Strickler*, 527 U.S. at 281-282. A *Brady* claim may arise when the prosecution: (1) introduces testimony that it knows, or should know, is perjury; (2) does not honor a defense request for specific exculpatory evidence; or (3) fails to volunteer exculpatory evidence not requested by the defense, or requested only generally. *United*

-22-

*States v. Frost*, 125 F.3d 346, 382 (6th Cir. 1997).  The failure to disclose such evidence is "material" and "prejudicial" to the defendant only when the evidence creates a reasonable probability of a different result.  *Strickler*, 527 U.S. at 280, 282.

In this case, Petitioner argues that letters, written by him and seized by the police from the deceased's home, were not turned over to defense counsel during discovery.  This Court finds that Petitioner has failed to establish his case for a *Brady* violation.  Although known to and authored by Petitioner, Petitioner does not (1) allege ever requesting the letters or state how the prosecution suppressed the evidence; (2) indicate how those letters were exculpatory or usable for impeachment; or (3) how they applied to his provocation defense.  Moreover, Petitioner does not show how he was prejudiced by not having the letters admitted into evidence.  A review of the record demonstrates that there is no support for Petitioner's contentions.  Therefore, Petitioner is not entitled to habeas relief regarding this claim.

**2.  Claim IV–Prosecutor's repeated use of graphic photographs of the deceased**

Next, Petitioner claims that he was denied a fair trial because the prosecution introduced photographs of the deceased's body to corroborate the testimony of eyewitnesses, thereby invoking sympathy from the jury.  The Michigan Court of Appeals rejected that claim.

An issue regarding the admissibility of evidence or error in state procedure does not rise to a level of constitutional magnitude unless it can be viewed as so egregious that the petitioner was denied a fundamentally fair trial.  *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir.), *cert. denied*, 125 S.Ct. 126 (2004).  To determine whether the admission or inadmissibility of evidence has denied a defendant's fundamental due process rights, the court should consider the extent to which the evidence is "critical" to the case, whether it "tend[s] to exculpate" the

accused, and whether the evidence bears "persuasive assurances of trustworthiness." *Clark v. O'Dea*, 257 F.3d 498, 503 (6th Cir. 2001). To the extent a petitioner's argument is based upon state law, the petitioner has failed to state a claim upon which habeas corpus relief may be granted. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).

The rulings by a state's highest court with respect to state law are binding on the federal courts. *Wainwright v. Goode*, 464 U.S. 78, 84 (1983). Furthermore, the Supreme Court has "reemphasize[d] that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). The federal courts are bound by decisions of an intermediate state appellate court unless convinced that the highest state court would decide the issue differently. *Olsen v. McFaul*, 843 F.2d 918, 929 (6th Cir. 1988).

Because Petitioner did not properly preserve this issue, the state appellate court reviewed for plain error, and found that Petitioner's substantial rights were not affected. It held: "[t]he photographs were probative because they corroborated the testimony of the eyewitnesses concerning the defendant's conduct, and it is not apparent that their probative value was substantially outweighed by the danger of unfair prejudice." *People v. Madyun*, No. 246016 2004 WL1459446 (Mich.App. June 29, 2004), slip op. at 3.

As noted by the Michigan Court of Appeals, the admission of the photographs was not improper. This Court also finds, as did the Michigan Court of Appeals, even if their admission were improper, any error was harmless. Petitioner has failed to demonstrate that he was prejudiced from the admission of the photographs.

Petitioner claims ineffective assistance of counsel for failing to object as cause, but, as discussed, in Claim VI in section E *infra*, Petitioner has failed to demonstrate that counsel's performance fell outside the wide range of reasonable professional conduct or overcome the presumption that counsel's performance constituted sound trial strategy. *Strickland v. Washington*, 466 U.S. 668, 689-694 (1984).

This Court therefore finds that the state appellate adjudication of Petitioner's Claim IV was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. Petitioner is therefore not entitled to habeas relief on this claim.

### D. Prosecutorial Misconduct–Claim V

In his fifth habeas claim, Petitioner contends that he was denied a fair trial because the prosecution argued facts not in evidence; specifically that Petitioner came to Michigan with a gun and a taser, where there was no evidence regarding the origin of either weapon. However, contrary to Petitioner's position, such an inference could be drawn from the evidence presented at trial; Petitioner drove directly to the deceased's home from North Carolina, met with her around 8:00 p.m., then returned after midnight, armed with a handgun and taser. Given the relatively short period of time in which to acquire those weapons, a rational trier of fact could reasonably have inferred that Petitioner brought them with him.

The United States Supreme Court has stated that prosecutors must refrain from improper methods calculated to produce a wrongful conviction. *Berger v. United States,* 295 U.S. 78, 88 (1935). To prevail on a prosecutorial misconduct claim, a habeas petitioner must demonstrate that the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974).

Factors to be considered in weighing the extent of a prosecutor's misconduct are: (1) the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; (2) whether they are isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury, and (4) the strength of the competent proof to establish the guilt of the accused. *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir.1997) (quoting *Serra v. Michigan Dept. of Corrections,* 4 F.3d 1348, 1355-56 (6th Cir.1993)). "[T]o constitute the denial of a fair trial, prosecutorial misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial, or so gross as probably to prejudice the defendant." *Id.* (citations omitted).

The Michigan Court of Appeals, the last court to issue a reasoned decision in this case, stated in pertinent part:

> Defendant also argues that the prosecutor improperly argued facts not in evidence when he stated that defendant brought the gun and the taser with him from North Carolina. We disagree.

> "Prosecutors may not make a statement of fact to the jury that is unsupported by the evidence, but they are free to argue the evidence and all reasonable inferences arising from it as they relate to the theory of the case." *People v Schutte*, 240 MichApp 713, 721; 613 NW2d 370 (2000). Because defendant did not object to the prosecutor's remarks, we review this issue for plain error affecting defendant's substantial rights. *Id.* at 720; *Carines*, *supra*.

> With regard to the gun, the prosecutor's argument was supported by the evidence because defendant admitted to the police that he had owned the gun for more than half a year, and the evidence also showed that defendant drove to Michigan from North Carolina shortly before the incident. Although the evidence did not disclose when defendant obtained the taser, in light of the evidence that the offense was committed shortly upon defendant's arrival in

> Michigan, we conclude that the prosecutor's argument that

> defendant also brought the taser from North Carolina was a
> reasonable inference based on the evidence.

*People v. Madyun*, No. 246016 2004 WL1459446 (Mich.App. June 29, 2004), slip op. at 3.

This Court agrees with the Michigan Court of Appeals' decision. Given the late hour, relatively short period of time, and the fact that petitioner had just driven in from North Carolina, it was reasonable for the prosecutor to argue the inference that Petitioner brought the weapons with him. Further, Petitioner has not established that a fundamental miscarriage of justice has occurred. The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent. *Schlup v. Delo,* 513 U.S. 298, 326 (1995). "[A]ctual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 624 (1998). To be credible, [a claim of actual innocence] requires Petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial. *Schlup,* 513 U.S. at 324.

Petitioner has made no such showing. This prosecutorial misconduct claim lacks merit, and therefore, Petitioner is not entitled to habeas relief on this claim.

### E.  Ineffective Assistance of Claim–Claim VI

Petitioner next contends that he is entitled to habeas relief because trial counsel was ineffective. Specifically, Petitioner argues that counsel was constitutionally deficient for failing to (1) object to the prosecution's use of the graphic photographs, and, (2) object to the prosecutor's prejudicial statements to the jury during closing arguments. Respondent contends that this claim lacks merit.

To establish ineffective assistance of counsel, it must be shown that counsel's

performance was deficient and that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable. *Strickland*, 466 U.S. at 687.

With respect to the performance prong of the *Strickland* test, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance. *Strickland*, 466 U.S. at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id.* at 689. A court must recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.* "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *McQueen v. Scroggy*, 99 F.3d 1302, 1311-12 (6th Cir. 1996) (quoting *Strickland*, 466 U.S. at 686).

The Michigan Court of Appeals denied Petitioner relief on his ineffective assistance of counsel claim, finding that "[h]aving determined that the photographs were properly admitted and that the prosecutor's argument was proper, it follows that defense counsel was not ineffective for failing to object to these matters." *People v. Madyun*, No. 246016 2004 WL1459446 (Mich.App. June 29, 2004), slip op. at 4. That decision is neither contrary to *Strickland* nor an unreasonable application thereof. Petitioner has not rebutted the presumption that trial counsel's conduct

throughout the proceedings constituted sound trial strategy. *See, e.g., Hutchinson v. Bell*, 303

F.3d 720, 749 (6th Cir. 2002) (decisions as to what evidence to present and whether to call certain

witnesses are matters of trial strategy).

Petitioner has thus failed to satisfy the requirements of *Strickland* and is not entitled to

habeas relief on his ineffective assistance of counsel claim.

### F.  Cumulative Effect Claim–Claim VII

Next, Petitioner contends that the cumulative effects of a number of trial errors denied him

a fundamentally fair trial.  The Michigan Court of Appeals addressed this issue as follows:

> Defendant argues that he was denied a fair trial because of
> the cumulative effect of multiple errors.  '[O]nly actual errors are
> aggregated to determine their cumulative effect." *People v Bahoda*,
> 448 Mich 261, 292 n 64; 531 NW2d 659 (1995).  Because
> defendant has not shown that any actual errors occurred, his claim
> that he was denied a fair trial because of the cumulative effect of
> multiple errors must likewise fail.

*People v. Madyun*, No. 246016 2004 WL1459446 (Mich.App. June 29, 2004), slip op. at 4.

Petitioner's claim is without merit.  Distinct constitutional claims cannot be cumulated to

provide a basis for habeas relief.  To justify a grant of habeas relief, a federal court must find a

violation of law that has been clearly established by the holdings of the United States Supreme

Court decisions at the time of the relevant state-court decision.  *King v. Bobby*, 433 F.3d 483, 490

(6th Cir. 2006).  "Cumulative error" cannot form the basis of habeas relief under § 2254.  *See*

*Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir.), opinion corrected on denial of rehearing, 307

F.3d 459 (6th Cir.2002) ("the Supreme Court has not held that distinct constitutional claims can

be cumulated to grant habeas relief"); *Scott v. Elo,* 302 F.3d 598, 607 (6th Cir.2002) ("[t]he

Supreme Court has not held that constitutional claims that would not individually support habeas

relief may be cumulated in order to support relief").  *See also, Campbell v. United States,* 364

F.3d 727, 736 (6th Cir.2004).

      As the Sixth Circuit explained in *Gillard v. Mitchell,* 445 F.3d 883 (6th Cir.2006):

> While we have recognized that "[e]rrors that might not be so
> prejudicial as to amount to a deprivation of due process when
> considered alone, may cumulatively produce a trial setting that is
> fundamentally unfair," *Walker v. Engle,* 703 F.2d 959, 963 (6th
> Cir.1983), the "Supreme Court has not held that distinct
> constitutional claims can be cumulated to grant habeas relief,"
> *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir.2002) (italics added).
> Thus, the Ohio courts' determination is not contrary to, or an
> unreasonable application of, clearly established Federal law as
> determined by the United State Supreme Court because Gillard's
> individual assignments of error would not support habeas relief, and
> the cumulative effect thereof is likewise insufficient. *See Scott v.
> Elo,* 302 F.3d 598, 607 (6th Cir.2002) (identical to case at bar).

*Gillard,* 445 F.3d at 898.

      Petitioner has not demonstrated any constitutional errors sufficient to support habeas

relief.  However, even if he had demonstrated such errors, those errors could not cumulate to

grant habeas relief under § 2254.  *Gillard,* 445 F.3d at 898.  Accordingly, Petitioner cannot seek

federal habeas relief on this issue.

### G.  Sentencing Claim–Claim VIII

      Finally, Petitioner claims that his sentence of life imprisonment violates the Michigan

Constitution's indeterminate sentencing requirement and also violates the Eighth Amendment

prohibition against cruel and unusual punishment.  To the extent that Petitioner asserts that his

sentence is disproportionate under state law, he fails to state a claim for federal habeas relief.  *See*

*Austin v. Jackson*, 231 F.3d 298, 300 (6th Cir. 2000) (citing *Pulley v. Harris*, 465 U.S. 37, 41

(1984)); *Atkins v. Overton*, 843 F. Supp. 258, 260 (E.D. Mich. 1994).  It is well-established that

habeas relief does not lie for perceived errors of state law.  *See, e.g., Estelle*, 502 U.S. at 67-68.

State courts are the final arbiters of state law and the federal courts will not intervene in such

matters.  *See Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987).  There is also no federal

constitutional right to individualized sentencing.  *See United States v. Thomas*, 49 F.3d 253, 261

(6th Cir. 1995).

Additionally, Petitioner is not entitled to relief on any claim that his sentence constitutes

cruel and unusual punishment under the Eighth Amendment.  The United States Constitution does

not require strict proportionality between a crime and its punishment.  *See Harmelin v. Michigan*,

501 U.S. 957, 965 (1991); *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000).

"Consequently, only an extreme disparity between crime and sentence offends the Eighth

Amendment."  *Marks*, 209 F.3d at 583.  A sentence that falls within the maximum penalty

authorized by statute "generally does not constitute 'cruel and unusual punishment.'"  *Austin*, 213

F.3d at 302 (quoting *United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1995)).  "Federal courts

will not engage in a proportionality analysis except in cases where the penalty imposed is death or

life in prison without possibility of parole."  *Thomas*, 49 F.3d at 261.

A habeas petitioner who seeks to challenge the severity of a prison sentence on Eighth

Amendment grounds faces a formidable challenge.  Generally, he may obtain relief only by

demonstrating that a state court decision contravened or misapplied "clearly established"

Supreme Court precedent.  However, the Supreme Court has acknowledged "that our precedents

in this area have not been a model of clarity."  *Lockyer*, 538 U.S. at 72.  "Indeed, determining

whether a particular sentence for a term of years can violate the Eighth Amendment, we have not

established a clear or consistent path for a court to follow."  *Id.*  Thus, the Supreme Court

declared that the general applicability of the proportionality standard to term-of-years' sentences was clearly established, but confessed a lack of clarity as to the factors lower courts should consider in making that determination. *Id.* The Court concluded that "the only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' framework is the gross disproportionality principle, the precise contours of which are unclear, applicable in the 'exceedingly rare' and 'extreme' case." *Id.* at 73.

In *Lockyer*, *supra*, the Supreme Court reversed the Ninth Circuit's grant of a writ of habeas corpus on the ground that two twenty-five-years-to-life sentences imposed under California's "three strikes" law, where the triggering felony was the theft of one hundred and fifty dollars worth of video tapes, violated the Cruel and Unusual Punishment Clause of the Eighth Amendment. The Court noted that the "thicket" created by its jurisprudence consisted primarily of its decisions in *Solem v. Helm*, 463 U.S. 277 (1983), *Harmelin v. Michigan*, 501 U.S. 957 (1991), and *Rummel v. Estelle*, 445 U.S. 263 (1980). The California state court observed that the proportionality rule set forth in *Solem* was cast into doubt by *Harmelin* and proceeded to analyze Andrade's sentence under the approach taken in *Rummel*, where the Supreme Court rejected a claim that a life sentence imposed under Texas' recidivist statute was grossly disproportionate to the theft felonies that formed the predicate for the sentence. The California court concluded that Andrade's sentence was not disproportionate. The Supreme Court held that the decision was not contrary to or an unreasonable application of federal law that was clearly established by the Supreme Court. *Lockyer*, 538 U.S. at 72-77.

*Harmelin*, *supra*, held that the Eighth Amendment does not require strict proportionality

between the crime and the sentence.  *Harmelin*, 501 U.S. at 965.  In *Harmelin*, the Supreme Court

upheld a life sentence without the possibility of parole for possession of more than 650 grams of

cocaine for an offender with no prior felony convictions.  Justice Kennedy recognized in his

concurring opinion in *Lockyer*, *supra*, that after *Harmelin,* the Cruel and Unusual Punishment

Clause of the Eighth Amendment forbids only an extreme disparity between crime and sentence,

that is, the Eighth Amendment forbids sentences that are "grossly disproportionate" to the crime.

*Harmelin*, 501 U.S. at 1001 (Kennedy, J., concurring);  *Coleman v. Mitchell*, 268 F.3d 417, 453

(6th Cir. 2001) (citing *Coker v. Georgia*, 433 U.S. 584, 592 (1977)); *United States v. Hopper*, 941

F.2d 419, 422 (6th Cir. 1991).

  In this case, the Michigan Court of Appeals, the last court to issue a reasoned opinion,

rejected the petitioner's sentence claim stating:

>   Finally, defendant challenges the constitutionality of his
> determinate life sentence for first-degree murder and two-year
> sentence for felony-firearm.  Contrary to what defendant argues, the
> Michigan Constitution does not prohibit the imposition of a
> determinate sentence for these crimes.  *People v Snider*, 239 Mich
> App 393, 425-429; 608 NW2d 502 (2000); *People v Cooper*, 236
> Mich App 643, 660-664; 601 NW2d 409 (1999).  In addition, a
> sentence of life imprisonment without the possibility of parole does
> not constitute cruel or unusual punishment.  *People v Hall*, 396
> Mich 650, 657-658; 242 NW2d 377 (1976); *People v Launsburry*,
> 217 Mich App 358, 363-364; 551 NW2d 460 (1996).

*People v. Madyun*, No. 246016 2004 WL1459446 (Mich.App. June 29, 2004), slip op. at 4.

  Here, the Court does not believe that Petitioner's sentence violated the Eighth

Amendment.  In contrast to *Harmelin*, *supra*, Petitioner here was convicted of first-degree

premeditated murder, assault with intent to murder, and felony-firearm.  The assault offense

involved Petitioner breaking into the deceased's home through a window, with a gun and a taser,

engaging in a struggle with, and shooting at, her boyfriend, beating the deceased, and then shooting the deceased as she tried to flee. An eyewitness testified that, after Petitioner shot the deceased, he stomped on her chest and said that he hoped she would die. Also the deceased's wounds indicated that she was pistol whipped and electrocuted with Petitioner's taser. Because the Supreme Court in *Harmelin*, *supra*, found that a life sentence without parole for the possession of cocaine to be constitutional, Petitioner's life sentence for the first-degree murder conviction and his fifteen to twenty-year sentence for the assault with intent to murder counts are not extreme or grossly disproportionate to the crime. MICH.COMP.LAWS § 750.316A and § 750.83. "[A] sentence within the statutory maximum set by statute generally does not constitute 'cruel and unusual punishment.'" *United States v. Organek*, 65 F.3d 60 (6th Cir, 1995) (quoting *United States v. Williams*, 15 F.3d 1356 (6th Cir. 1994)). As long as the sentence remains within the statutory limits, trial courts have historically been given wide discretion in determining "the type and extent of punishment for convicted defendants." *Austin v. Jackson*, 213 F.3d 298 (6th Cir. 2000) (quoting *Williams v. New York*, 337 U.S. 2414 (1949)).

Because the state courts' adjudications regarding Petitioner's sentences were neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, Petitioner is not entitled to habeas relief on this claim.

## V. Conclusion

The state court decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. Petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.


s/Marianne O. Battani
Marianne O. Battani
United States District Judge

Date: September 7, 2007